**WATKINS MOTOR LINES, INCORPORATED, a Florida corporation, et al., Plaintiffs,**

v.

**ZERO REFRIGERATED LINES, a Texas corporation; and Continental National Assurity Group, an Illinois corporation, Defendants.**

**No. 73 C 1517.**

United States District Court, N. D. Illinois, E. D.

Sept. 11, 1974.

Murphy, Vinson & Hazlett, Tucson, Ariz., Baker & McKenzie, Chicago, Ill., for plaintiffs.

Lord, Bissell & Brook, Chicago, Ill., for defendants.

## MEMORANDUM OPINION

AUSTIN, District Judge.

This is an action by one trucking company against another for indemnification under the regulations of the Interstate Commerce Commission for damages the plaintiff paid in settlement of a personal injury case. In the course of pleading, the defendant filed a counterclaim for indemnification pursuant to the terms of an interchange of equipment agreement between the two companies. The other parties to the action are the companies' respective liability insurers. Federal jurisdiction is predicated upon the diversity of the parties' citizenship and an amount in controversy in excess of $10,000. The case is presently before this court to resolve the issues of law presented by plaintiffs' motion for summary judgment. For the reasons that follow, that motion is denied. Furthermore, summary judgment is entered in favor of the defendants as to the complaint.

### I.

The undisputed facts in this case are as follows:

Plaintiff Watkins Motor Lines, Incorporated ("Watkins") and defendant Zero Refrigerated Lines ("Zero") are common carriers in interstate commerce. Each company is authorized by the I.C.C. to operate over certain truck routes where the other company is not so authorized. For example, Zero is authorized to operate between Dallas, Texas and Tucson, Arizona, whereas Watkins is not.

Sometime in 1971 or early 1972, Watkins contracted to transport a truckload of Girl Scout Cookies from Elizabeth, New Jersey to Tucson, Arizona on a through bill of lading. Apparently be-

cause it did not have enough trucks in its fleet to perform the contract, Watkins entered into a "trip lease" agreement with Willie Nixon who owned and, with the assistance of David Reynolds, drove his own tractor-trailer rig. Basically, the agreement provided that the rig was leased to Watkins for the one trip, and that Nixon would drive it under the Watkins name. The route Nixon was to travel went from Elizabeth to Dallas and then on to Tucson. Because it was not permitted to operate between Dallas and Tucson, Watkins entered into an "interchange of equipment" agreement with Zero whereby Nixon was to transport the goods on the last leg of the trip under the Zero name. In substance and effect, then, Watkins leased the truck from Nixon and retained him and Reynolds as drivers under the trip lease agreement; and, for the Dallas to Tucson leg of the trip, Watkins leased from Zero the right to travel over Zero's route under the Zero name pursuant to the interchange of equipment agreement.

The gross revenue generated by the trip was $1,084.20. That sum was divided up so that Zero would receive $407.12 and Watkins would receive $677.08. However, Zero paid back $346.05 for "rental" of the truck, resulting in a net income to Zero of $61.07.

On February 25, 1972, the loaded truck arrived at the Zero truck yards where it was inspected by a Zero employee. The Watkins name on the truck was replaced by the Zero name, the "lease" papers were signed, and Nixon and Reynolds then embarked on the last leg of their trip. Several days later, before the goods were delivered, the truck was involved in an automobile accident in Tucson which resulted in the death of Patricia Uphaus.

In January of 1973, the Uphaus family sued Nixon, Reynolds, Watkins and Zero for the wrongful death of Patricia Uphaus. Watkins made a tender of the defense of the action to Zero, but it was refused. The parties subsequently settled the lawsuit for $575,000 with Watkins' insurers contributing $275,000 and Zero's insurer contributing $300,000. In settling, Watkins and Zero specifically reserved all the rights which they might have against each other. This litigation followed.

Watkins' complaint is comprised of two counts. Count I claims that the I.C. C. regulations governing interstate truck leasing practices obligated Zero to take over the defense in the *Uphaus* action and to indemnify Watkins and its insurer for any damages that the latter were required to pay out. Count II basically sets forth the same claim against Zero's insurer.

Zero's counterclaim seeks to recover $300,000 from Watkins on the ground, *inter alia*, that the equipment interchange agreement with Watkins required the latter to hold Zero harmless from any liability connected with the use of the truck on Zero's route between Dallas and Tucson. That agreement reads, in pertinent part:

> "Lessor agrees, during the term of this lease—
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> F. To indemnify lessee against any loss or damage resulting from the negligence, incompetence or honesty (sic) of said driver(s)."

Another general agreement previously entered into by the parties reads as follows:

> "The Insured, a Corporation: Watkins Motor Lines, Inc. hereby agrees to hold Zero Refrigererated Lines and its Insurance Underwriters harmless of any liability in connection with the use and operation of automotive equipment by the Insurer: Watkins Motor Lines, Inc. over routes in connection with an (sic) pursuant to operating rights heretofore issued by various motor carrier regulatory bodies and to indemnify Zero Refrigerated Lines and its insurance underwriters from any loss or damage which may sustain by reason of such use and operation of said equipment by The Insured: Watkins Motor Lines, Inc."

Although it does not so state, Watkins' claim for indemnification appears to be founded on 49 C.F.R. § 1057.4, which reads in pertinent part as follows:

"§ 1057.4 *Augmenting Equipment. Other than equipment exchanged between motor common carriers in interchange service as defined in § 1057.5,* authorized carriers may reform authorized transportation in or with equipment which they do not own only under the following conditions:

(a) Contract requirements. The contract, lease, or other arrangement for the use of such equipment:

\* \* \* \* \* \*

(4) *Exclusive possession and responsibilities.* Shall provide for the exclusive possession, control, and use of the equipment, and for the *complete assumption of responsibility* in respect thereto, by the lessee for the duration of said contract, lease or other arrangement. . . . " (emphasis added).

In support of its pending motion, Watkins relies primarily on the case of Alford v. Major, 470 F.2d 132 (7th Cir. 1972). There, the court held unenforceable an indemnification clause in a trip lease agreement which obligated the lessor of a truck to indemnify the lessee for any liability imposed on the latter as a result of negligence of the lessor or the lessor's driver. The ground for the court's ruling was that such an agreement, under the circumstances, would contravene the public policy embodied in 49 C.F.R. § 1057.4, *supra*; for there had been a *prima facie* showing that the parties violated the regulation by failing to give the lessee full control of the operation of the truck in question.

■ Defendants contend, and in my opinion correctly so, that neither § 1057.4 nor the *Alford* decision are applicable here because they govern a *trip* lease agreement—not an *interchange of equipment* agreement such as the one involved in the present case. Rather, the governing regulation is 49 C.F.R. § 1057.5, which reads in relevant part as follows:

"§ 1057.5 *Interchange of equipment.* Authorized common carriers may by contract, lease, or other arrangement, interchange any equipment defined in § 1057.2 (i. e., any motor vehicle for transportation of property for hire by authorized carriers) with one or more other such common carriers, or one of such carriers may receive from another such carrier, any of such equipment, in connection with any through movement of traffic under the following conditions:

\* \* \* \* \* \*

(f) *Connecting carriers considered as owner.*

An authorized carrier receiving equipment in connection with a through movement shall be considered the owner of the equipment for the purpose of leasing the equipment to other authorized carriers in furtherance of the movement to destination or the return of the equipment after the movement is completed."

Nowhere in this section is it provided, as it is in § 1057.4(a)(4), that the lessee shall take complete responsibility for, and control of, the operation of the truck in question. Therefore, it is impossible to conclude that Watkins is entitled to be indemnified by Zero for its share of the settlement in the *Uphaus* litigation.

On the contrary, as I indicated in General Expressways, Inc. v. Schreiber Freight Lines, Inc., 377 F.Supp. 1159 (N.D.Ill.1974), the distribution of risks undertaken by the type of contract involved here does not impair the policy established by Congress in favor of preserving highway safety;[1] for its effect

---

1. The statute authorizing the I.C.C. to promulgate trucking regulations, 49 U.S.C. § 304(e) reads as follows:

"(e) (T)he Commission is authorized to prescribe, with respect to the use by motor carriers (under leases, contracts, or

on the exercise of due care by drivers and their employers in the operation of trucking equipment is no different than the effect of insurance. Because neither the statute nor the regulations promulgated thereunder prohibit the shifting of risks in the trucking business by means of insurance, there is no real basis to prohibit the type of risk-shifting involved in an indemnity clause in either a trip lease or an interchange of equipment agreement. As stated by the Court in Allstate Insurance Co. v. Alterman Transportation Lines, Inc., 465 F. 2d 710, 713 (5th Cir. 1972),

"We are of the opinion that had the I. C.C. intended to prevent indemnification between trucking companies it would have said so in precise terms."

*Accord*, Carolina Freight Carriers Corp. v. Pitt County Transportation Co., 492 F.2d 243, 246 (4th Cir. 1974).

Lastly, as was stated in General Expressways, Inc. v. Schreiber Freight Lines, Inc., *supra*:

"Any lingering doubt created by (the lessor's) public policy argument is dispelled by the public policy of fostering freedom of contract. In Baltimore & Ohio Southwestern Railway Company v. Voight, 176 U.S. 498, 505, [20 S.Ct. 385, 44 L.Ed. 560] (1900), the Court said it must not be forgotten that,

'the right of private contract is no small part of the liberty of the citizen, and that the usual and most important function of courts of justice is rather to maintain and enforce contracts than to enable parties thereto to escape from their obligation on the pretext of public policy, unless it clearly appears that they clearly contravene public right or public welfare.'" 377 F.Supp. at 1161.

It is concluded not only that plaintiffs are not entitled to summary judgment, but that judgment should be entered in favor of the defendants as to the claims presented in the complaint.

■ The fact that defendants did not choose to file a cross-motion for summary judgment does not preclude the court from entering judgment in their favor.

"If either the proponent of the claim or the defending party moves for a summary judgment, and the court finds that the moving party is not entitled thereto, but that the other party is so entitled, it would seem that the court has the power to enter the proper judgment, although a cross-motion therefor was not made. Rule 54(c) gives the court the power to enter the final judgment to which the prevailing party is entitled, even if the party has not demanded such relief in his pleadings, except in default judgment cases. The theory is that the form of the pleadings, should not place a limitation upon the power of the court to do justice. So where one party has invoked the power of the court to render a summary judgment against his adversary, it is reasonable that this invocation gives the court power to

---

other arrangements) of motor vehicles not owned by them, in the furnishing of transportation of property—

(1) regulations requiring that any such lease, contract, or other arrangement shall be in writing and be signed by the parties thereto, shall specify the period during which it is to be in effect, and shall specify the compensation to be paid by the motor carrier, and requiring that during the entire period of any such lease, contract, or other arrangement a copy thereof shall be carried in each motor vehicle covered thereby; and

(2) such other regulations as may be reasonably necessary in order to assure that while motor vehicles are being so used the motor carriers will have full direction and control of such vehicles and will be fully responsible for the operation thereof in accordance with applicable law and regulations, as if they were the owners of such vehicles, including the requirements prescribed by or under the provisions of this chapter respect to safety of operation and equipment and inspection thereof, which requirements may include but shall not be limited to promulgation of regulations requiring liability and cargo insurance covering all such equipment."

render a summary judgment for his adversary if it is clear that the case warrants that result." 6 Moore's Federal Practice Par. 56.12 at 2241.

The facts in this case are undisputed; and plaintiffs' theory that they are entitled to indemnification under Alford v. Major, *supra* and § 1057.4 of the I.C.C. regulations is simply contrary to the law as I read it. Since it is today held that plaintiffs are not entitled to judgment as a matter of law under the undisputed facts of the case, the only logical conclusion is that summary judgment must be entered in favor of the defendants as to the complaint. The counterclaim is left pending.

It is so ordered.