# TRANSAMERICAN FREIGHT LINES, INC. *v.* BRADA MILLER FREIGHT SYSTEMS, INC., ET AL.

No. 74–54.   Argued October 8, 1975—Decided November 12, 1975

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, STEWART, WHITE, MARSHALL, POWELL, and REHNQUIST, JJ., joined. DOUGLAS, J., concurred in the judgment.

*Alphonso H. Voorhees* argued the cause and filed briefs for petitioner.

*Joseph L. Leritz* argued the cause and filed a brief for respondent Brada Miller Freight Lines, Inc.*

MR. JUSTICE BLACKMUN delivered the opinion of the Court.

In this case we are concerned with the "control and responsibility" requirement of the Interstate Commerce Commission's equipment leasing regulation, 49 CFR § 1057.3 (a) (1975),[1] applicable to authorized motor car-

---

*Solicitor General Bork, Assistant Attorney General Kauper, Carl D. Lawson, Fritz R. Kahn,* and *Betty Jo Christian* filed a brief for the United States et al. as *amici curiae* urging reversal.

[1] The pertinent phrase in 49 CFR § 1057.3 (a) (1975) is "control and responsibility for the operation of the equipment." Section 1057.3 (a) reads in full as follows:

"The provisions of § 1057.4, except paragraphs (c) and (d), relative to inspection and identification of equipment, shall not apply:

"(a) *Equipment used in the direction of a point which lessor is authorized to serve.* To equipment owned or held under a lease of 30 days or more by an authorized carrier and regularly used by it in the service authorized, and leased by it to another authorized carrier for transportation in the direction of a point which lessor is authorized to serve: *Provided,* That the two carriers have first

riers. The question before us is narrow: Does the control-and-responsibility requirement prohibit, as against public policy, an agreement between carriers by which the lessor indemnifies the lessee for loss caused by the negligence of the lessor?

I

On January 19, 1968, respondent Brada Miller Freight Systems, Inc., entered into an agreement with petitioner Transamerican Freight Lines, Inc., whereby Brada Miller, as lessor, leased to Transamerican, as lessee, a tractor and trailer operated by driver H. L. Hardrick for a trip from Detroit, Mich., to Kansas City, Mo.[2] Transamerican held authority from the ICC to serve those points, and the leased equipment was to be operated over Transamerican's routes "without deviation." Brada Miller represented that, as § 1057.3 (a) specifies, Kansas City was "in the direction of a point" which it was "authorized to serve." The lease recited that the equipment was

agreed in writing that control and responsibility for the operation of the equipment shall be that of the lessee from the time the equipment passes the inspection required to be made by lessee or its representative under § 1057.4 (c) until such time as the lessor or its representative shall give to the lessee or its representative a receipt specifically identifying the equipment and stating the date and the time of day possession thereof is retaken or until such time as the required inspection is completed by another authorized carrier taking possession of the equipment in an interchange of equipment where such use is contemplated, such writing to be signed by the parties or their duly authorized regular employees or agents, and a copy thereof carried in the equipment while the equipment is in the possession of the lessee."

In § 1057.4 (a) (4), relating to equipment other than that exchanged in interstate service and other than that leased by one authorized carrier to another, the parallel provision is "exclusive possession, control, and use of the equipment, and . . . the complete assumption of responsibility in respect thereto."

[2] At the time, Brada Miller itself held the equipment under a lease dated November 1967.

"to be operated only by a competent employee" of Brada Miller, "in which event said employee . . . shall be the representative of" Brada Miller. App. 90; Brief for Petitioner A-2. It further provided:

"4. It is mutually understood and agreed, that [Transamerican] during the term of this lease shall have the control and responsibility for the operation of said equipment in respect to the public, shippers and Interstate Commerce Commission for such period that said equipment is operated under the terms of this lease as provided in Paragraph 1 hereof.

.        .        .        .        .

"9. . . . [Brada Miller] hereby agrees to indemnify and save harmless [Transamerican] from any and all claims, suits, losses, fines or other expenses arising out of, based upon or incurred because of injury to any person or persons, or damage to property sustained or which may be alleged to have been sustained by reason of any negligence or alleged negligence on the part of [Brada Miller], its agents, servants or employees . . . . Nothing in this Paragraph 9 contained shall be construed to in anywise limit the liability of [Transamerican] to the public in connection with the use of said equipment under this Agreement." *Ibid.*

Hardrick was a Brada Miller driver and employee. Pursuant to the Commission's regulation, 49 CFR § 1057.4 (c) (1975), Transamerican, before the trip, made the required inspection of the equipment and filed a report that it was safe. App. 66–67, 89, 90. It checked the medical report on Hardrick. *Id.*, at 75. It affixed to the door of the tractor an identification placard stating that it was operated by Transamerican and reciting its number assigned by the ICC; the placard remained so affixed throughout the trip. *Id.*, at 55–58, 63–65.

On the way to Kansas City, and near Smithboro, Ill., the vehicle driven by Hardrick and an automobile operated by Sandra Wear collided. Wear was injured. Transamerican reported the accident on the ICC's prescribed form. Wear later filed suit in the United States District Court for the Southern District of Illinois against both Brada Miller and Transamerican. She alleged that the accident was caused by Hardrick's negligence. Brada Miller and Transamerican filed cross-claims against each other in that litigation. During the trial Wear settled her claim against Transamerican for $80,000 and dismissed her cause of action with prejudice.[3] Transamerican then amended its cross-claim by pleading the settlement and seeking recovery from Brada Miller for the settlement amount plus the expenses incurred in defending the Wear action.

Brada Miller in due course moved for summary judgment against Transamerican. It did so on the ground that "the pleadings, depositions, answers to interrogatories and exhibits on file show that the indemnity provision of the trip lease . . . is contrary to public policy and is unenforceable." *Id.*, at 91.

The District Court granted Brada Miller's motion. In an unreported opinion, the court cited § 204 (e) of the Interstate Commerce Act, 24 Stat. 379, as added, 49 Stat. 543, as amended, 49 U. S. C. § 304 (e),[4]

---

[3] The order of dismissal preserved the rights of Transamerican in its cross-claim against Brada Miller. Diversity of citizenship remained after the settlement.

[4] "Subject to the provisions of subsection (f) [setting forth exceptions not material here] of this section, the Commission is authorized to prescribe, with respect to the use by motor carriers (under leases, contracts, or other arrangements) of motor vehicles not owned by them, in the furnishing of transportation of property—

"(1) regulations requiring that any such lease, contract, or other arrangement shall be in writing and be signed by the parties thereto,

which authorizes the Commission to prescribe regulations with respect to motor carriers' use, under leases, of motor vehicles not owned by them, and § 1057.4 (a)(4) of the regulations,[5] issued pursuant to that authority, as governing the lease between Brada Miller and Transamerican. It then followed what it regarded as precedent that had been established by its controlling court in *Alford* v. *Major,* 470 F. 2d 132 (CA7 1972). In *Alford* the Seventh Circuit had concluded:

> "Therefore, since the indemnification clause would permit Major to circumvent the regulations' requirement that leased carriers exert actual control over the leased equipment and the borrowed drivers, we

shall specify the period during which it is to be in effect, and shall specify the compensation to be paid by the motor carrier, and requiring that during the entire period of any such lease, contract, or other arrangement a copy thereof shall be carried in each motor vehicle covered thereby; and

"(2) such other regulations as may be reasonably necessary in order to assure that while motor vehicles are being so used the motor carriers will have full direction and control of such vehicles and will be fully responsible for the operation thereof in accordance with applicable law and regulations, as if they were the owners of such vehicles, including the requirements prescribed by or under the provisions of this chapter with respect to safety of operation and equipment and inspection thereof."

[5] Under the facts, this appears to be an inadvertent reference. Section 1057.3 of the regulations states that the cited § 1057.4, "except paragraphs (c) and (d)" thereof, "shall not apply" to certain equipment, such as the tractor and trailer in question, leased by one authorized carrier to another authorized carrier, provided that the carriers "have first agreed in writing that control and responsibility for the operation of the equipment shall be that of the lessee." See n. 1, *supra.* Brada Miller and Transamerican were authorized carriers and they had made the specified agreement. The section's proviso, however, in substance is the same as the parallel provision in § 1057.4 (a) (4), cited by the District Court. The miscitation, therefore, is of no significance here.

find that the indemnification clause is unenforceable." *Id.,* at 135.

The Court of Appeals affirmed with an unpublished opinion. *Wear v. Transamerican Freight Lines,* 497 F. 2d 926 (CA7 1974). It, too, relied on 49 U. S. C. § 304 (e), on 49 CFR § 1057.4, and on its earlier *Alford* case. It emphasized its observation in *Alford,* 470 F. 2d, at 135, quoting the trial court in that case, that the intent of the regulations " 'was to make sure that licensed carriers would be responsible in fact, as well as in law, for the maintenance of leased equipment and the supervision of borrowed drivers.' " Pet. for Cert. A–10. It felt that "control and cost bearing" were related, and that the regulations required the party with the duty of responsibility and control under. the statute "to internalize the cost of any breach of this duty." *Id.,* at A–12. It reasoned that inasmuch as Brada Miller had agreed to bear the costs of its own negligence, it had assumed control and responsibility and that the indemnification clause therefore was ineffective.

Because the Court of Appeals asserted, *ibid.,* that *Alford* could not be distinguished from *Allstate Ins. Co. v. Alterman Transport Lines, Inc.,* 465 F. 2d 710 (CA5 1972), we granted certiorari.[6]   420 U. S. 971 (1975).

---

[6] Despite the presence of some distinguishing features, and despite some attempts to distinguish, cases seemingly consistent with the decision below are *Denver Midwest Motor Freight, Inc. v. Busboom Trucking, Inc.,* 190 Neb. 231, 207 N. W. 2d 368 (1973), and *Gordon Leasing Co. v. Navajo Freight Lines,* 130 N. J. Super. 290, 326 A. 2d 114 (1974). Seemingly opposed, in addition to *Alterman,* are *Carolina Freight Carriers Corp. v. Pitt County Transportation Co.,* 492 F. 2d 243 (CA4 1974), cert. pending, No. 73–1750; *Indiana Refrigerator Lines, Inc. v. Dalton,* 516 F. 2d 795 (CA6 1975), cert. pending, No. 75–211; *Indiana Ins. Co. v. Parr Trucking Service, Inc.,* 510 F. 2d 490, 494 (CA6 1975); *Jones Truck Lines, Inc. v. Ryder Truck Lines, Inc.,* 507 F. 2d 100 (CA6 1974),

## II

The issue before us, therefore, is whether the indemnification provision in the lease agreement between Brada Miller and Transamerican violates the Commission's applicable regulation and. as a consequence, is contrary to public policy and unenforceable. In order to place the issue in proper perspective, we note, initially, certain general aspects of motor carrier operations.

Demand for a motor carrier's services may fluctuate seasonally or day by day. Keeping expensive equipment operating at capacity, and avoiding the waste of resources attendant upon empty backruns and idleness, are necessary and continuing objectives. It is natural, therefore, that a carrier that finds itself short of equipment necessary to meet an immediate demand will seek the use of a vehicle not then required by another carrier for its operations, and the latter will be pleased to accommodate. Each is thereby advantaged.

A lease of equipment, which is permissible under defined circumstances, must be distinguished, however, from a sharing or lending of operating authority, which is not permitted. Under the Motor Carrier Act, 1935,

---

pet. for cert. pending, No. 74–973; *Cooper-Jarrett, Inc.* v. *J. Miller Corp.,* 70 Misc. 2d 88, 332 N. Y. S. 2d 177 (1972); *Newsome* v. *Surratt,* 237 N. C. 297, 74 S. E. 2d 732 (1953); *Continental Ins. Co.* v. *Daily Express, Inc.,* 68 Wis. 2d 581, 229 N. W. 2d 617 (1975). See *General Expressways, Inc.* v. *Schreiber Freight Lines, Inc.,* 377 F. Supp. 1159 (ND Ill. 1974), where a District Court in the Seventh Circuit reached the conclusion that the indemnification agreement was not unenforceable as against public policy. See also *Watkins Motor Lines, Inc.* v. *Zero Refrigerated Lines,* 381 F. Supp. 363 (ND Ill. 1974), aff'd, 525 F. 2d 538 (CA7 1975), involving an indemnification contract that accompanied an interchange agreement. The Seventh Circuit itself concluded that the indemnification agreement "serves a useful purpose and must be upheld." *Id.,* at 540. The Circuit's earlier contrary decision in *Alford,* it was felt, was "inapposite."

49 Stat. 543, as amended, 49 U. S. C. §§ 301–327, only a properly certificated carrier may haul freight in interstate or foreign commerce. Each certificate is limited as to routes, destinations, and classes of freight. 49 U. S. C. § 308 (a). See *Nelson, Inc.* v. *United States,* 355 U. S. 554 (1958); *Kreider Truck Service, Inc., Extension—Lard Oils,* 82 M. C. C. 565 (1960). As a consequence, the Commission has developed and designed its responsibility-and-control regulations in order to prevent a sharing of operating authority under the guise of a lease of equipment. With only special exceptions, the regulations require the lessee to ship under its own bill of lading, to compensate the lessor on an established basis, to inspect the equipment, and to assume full control and responsibility for the operation. 49 CFR §§ 1057.3 (a) and 1057.4. The regulations, however, do not require the lessee itself to operate the equipment; the lessor may perform that task by furnishing the driver with the equipment. But the lessee must assume the responsibility for the shipment and have full authority to control it.

### III

The regulations were formulated in the 1950's in the rulemaking procedure known as *Ex parte No. MC–43.* See *Lease and Interchange of Vehicles by Motor Carriers,* 51 M. C. C. 461 (1950); 52 M. C. C. 675 (1951); 64 M. C. C. 361 (1955); and 68 M. C. C. 553 (1956). The initial formulation was sustained, against a variety of attacks, in *American Trucking Assns.* v. *United States,* 344 U. S. 298 (1953). There the Court outlined as background "the existing conditions of the motor truck industry and its regulation." *Id.,* at 302. It referred to the development of the practice by authorized carriers of using nonowned equipment by interchange and by leasing. *Id.,* at 303. "The use of nonowned equipment

by authorized carriers is not illegal, either under the Act or the rules under consideration." *Id.*, at 303–304 (footnote omitted). But it noted that the record in that case contained proof of abuses and evasions of certificated authority and of safety requirements, difficulties in the fixing of the lessee's responsibility, and other problems. *Id.*, at 304–306.

After a detailed examination of the proceedings of the Commission that resulted in the promulgation of the protective provisions at issue in this case, the Court observed: "The purpose of the rules is to protect the industry from practices detrimental to the maintenance of sound transportation services consistent with the regulatory system," and to assure safety of operation. *Id.*, at 310. "So the rules in question are aimed at conditions which may directly frustrate the success of the regulation undertaken by Congress." *Id.*, at 311. It is apparent, therefore, that sound transportation services and the elimination of the problem of a transfer of operating authority, with its attendant difficulties of enforcing safety requirements and of fixing financial responsibility for damage and injuries to shippers and members of the public, were the significant aims and guideposts in the development of the comprehensive rules.

It is likewise apparent that an important feature of the remedy the Commission devised to eliminate the undesirable practices was the rule that any lease in which the lessor furnished the driver was to be one for 30 days or more. See 49 CFR §§ 1057.3 (a) and 1057.4 (a)(3). This served to eliminate the "hard core of the problem," that is, "the owner-operator trip lease and its attendant evils." 68 M. C. C., at 555. It was effectuated by the provisions, some mentioned above, that the lease be in writing and negotiated in advance; that the equipment be identified as that of the lessee; that the lease provide

for payment to the lessor at a specified rate; that the lessee conduct a safety inspection before taking possession; and that the lessee have control and responsibility for the operation of the equipment.

Obviously, the inspection requirement of § 1057.4 (c), applicable to carriers to which § 1057.3 (a) relates, is of distinct importance. It is addressed in part to any apprehension that a lessor might furnish equipment less reliable than that of the certificated lessee. And the requirement that the lessee assume control and responsibility tends to assure that a party directly responsible to the Commission is in actual charge of the operation.

### IV

In light of this background—the early conditions in the industry, the problems that existed, the rules that were evolved to resolve those problems, and the purpose of the rules—we turn specifically to the indemnification clause in the Brada Miller-Transamerican lease.

A. Whether the presence of an indemnification clause conflicts with the lease's further provision, required by § 1057.3 (a), that the lessee shall have full operational control and responsibility, was a question not directly addressed in *Ex parte No. MC–43*. We readily conclude, however, that the two provisions are not in conflict and that the indemnification clause does not impinge upon the requirements of the lease and of § 1057.3 (a) that operational control and responsibility be in the lessee. Paragraph 4 of the lease is, of course, express and clear. The parties agreed in writing that "the control and responsibility for the operation of said equipment" were in Transamerican, as lessee. This is what § 1057.3 (a) requires and it is all that it formally requires. Moreover, added to the bare words of assumption of control and responsibility, was the specification that

this was directed "to the public, shippers and Interstate Commerce Commission." The separate indemnification clause in the subsequent paragraph 9 of the lease did not affect this basic responsibility of the lessee to the public; it affected only the relationship between the lessee and the lessor. The final sentence of paragraph 9 made this clear:

> "Nothing in this paragraph 9 contained shall be construed to in anywise limit the liability of [Transamerican] to the public in connection with the use of said equipment under this Agreement."

And in this very case it was Transamerican which defended the Wear suit and settled it.

It is to be acknowledged, to be sure, that the lessor's furnishing of a driver allows an aspect of control, in a sense, to remain in the lessor. But this is ministerial control, not control of the kind with which the Commission was concerned in *Ex parte No. MC–43*. Its concern, as we have noted, was with operating authority, with routes and destinations and classes of freight, with the integrity of certifications, and with that ultimate control in the lessee that makes and keeps it responsible to the public, the shipper, and the Commission. The Commission observed:

> "It now seems to be accepted that when an authorized carrier furnishes service in vehicles owned and operated by others, he must control the service to the same extent as if he owned the vehicles, but need control the vehicles only to the extent necessary to be responsible to the shipper, the public, and this Commission for the transportation." 52 M. C. C., at 681.

The regulations do not expressly prohibit an indemnification provision in the agreement between the lessor

and the lessee. In fact, they neither sanction nor forbid it. It would seem to follow, then, that the mere presence of a clause such as the one here—that the lessor is to bear the burden of its own negligence—does not, in and of itself, offend the regulations so long as the lessee does not absolve itself from the duties to the public and to shippers imposed upon it by the Commission's regulations. This is not to say, of course, that the presence of an indemnification clause, or its character, may not be a factor to be considered in determining whether a particular arrangement between carriers is an illegal sharing of operating authority or is a legal lease of equipment.

The Commission, on occasion, has considered an indemnification clause as one element, among others, that may demonstrate lack of control and responsibility in the lessee. See *Tanksley Transfer Co. Extension— Points in Four States,* 110 M. C. C. 674, 678–679 (1969); *Diamond Transportation System, Inc., Extension—Wisconsin and Oklahoma Origins,* 117 M. C. C. 706, 712–713 (1973). But the Commission has never condemned the indemnification clause in isolation.

Although one party is required by law to have control and responsibility for conditions of the vehicle, and to bear the consequences of any negligence, the party responsible in law to the injured or damaged person may seek indemnity from the party responsible in fact. The indemnification agreement violates the Commission rules only if accompanied by other indicia demonstrating that the lessor was in control of the service provided as well as of the physical operation of the vehicle. But the clause in isolation—as framed by the issue before the District Court on the motion for summary judgment, and before the Court of Appeals, and now before us— does not do so.

B. We similarly conclude that the indemnification clause by itself does not conflict with the regulations' safety provisions. Safety in motor vehicle operation, of course, was an important concern of the Commission in its development of the equipment-leasing regulations. *American Trucking Assns.* v. *United States,* 344 U. S., at 305; 52 M. C. C., at 686–696. This concern is reflected in the provisions of §§ 1057.4 (c) and 1057.4 (e) relating, respectively, to vehicle inspections and driver familiarity with safety regulations. These provisions apply regardless of the existence of an indemnification agreement, and the lessee may fully comply with the requirements of the regulations despite its having contracted for indemnification.

An indemnification provision with respect to the lessor's negligence does not necessarily tend to lessen operational safety. On the contrary, it may increase it. The lessor, as a general rule, is the party more familiar with the equipment it leases and with the experience, ability, and record of the driver it furnishes. An agreement placing the ultimate financial responsibility upon the negligent lessor thus may have a tendency to provide greater protection to the public and to shippers. At the same time, the lessee's control and responsibility may then become more meaningful. It may also be said that the indemnification provision produces an additional source of funds for the one who is damaged or injured. These, of course, are factors that are pertinent in the evaluation of administrative policy; they are not now for this Court to evaluate. We hold only that the presence in an equipment lease of an indemnification clause directed to the lessor's negligence is not in conflict with the safety concerns of the Commission or with the regulations it has promulgated.

We utter a word of caution: our decision is not to be regarded as an indication that the Commission, if it so chooses upon study of the problem, may not one day regulate or even proscribe indemnification as between lessee and lessor.[7] We merely hold that the present regulations may not be so interpreted. See *Chicago, R. I. & P. R. Co.* v. *Chicago, B. & Q. R. Co.*, 437 F. 2d 6, 9–10 (CA7), cert. denied, 402 U. S. 996 (1971).

We therefore find ourselves in disagreement with the Court of Appeals. We emphasize that our disagreement must· be viewed in the light of the narrow character of the Court of Appeals' holding to the effect that the indemnification clause in this particular agreement, in isolation, served to circumvent the regulations and was against public policy and was unenforceable. It is with that holding that we disagree and we reverse. Other issues raised by Transamerican's cross-claim and Brada Miller's answer thereto, as the parties recognize, remain undetermined. Among these, seemingly, are the questions whether the negligence that caused Wear's injury was that of Brada Miller, and whether the agreement, as a whole, was a legal lease of equipment or was an illegal

---

[7] The Commission and the United States in their joint brief as *amici curiae* submit that the indemnification clause by itself is not in violation of the regulations. They acknowledge that the current regulations do not specifically determine the issue before us; that on some occasion in the future the Commission may consider the promulgation of rules that bear upon indemnification agreements; and that, if so, it is possible that the Commission may come to one conclusion with respect to a provision protecting the lessee against the consequences of its own negligence, and to an opposite conclusion with respect to a provision relating to the negligence of the lessor. We note the Commission's submission here in view of the longstanding and recognized rule of deference. *Bowles* v. *Seminole Rock Co.*, 325 U. S. 410, 414 (1945); *Udall* v. *Tallman*, 380 U. S. 1, 16–17 (1965).

sharing of operating authority. We express no view as to those issues; they are to be resolved upon remand.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings.

*It is so ordered.*

MR. JUSTICE DOUGLAS concurs in the judgment.