## AUTO–OWNERS (MUTUAL) INSURANCE COMPANY, Plaintiff,

v.

## MIDWEST EMERY FREIGHT SYSTEM, INC., Nass Truck Lines, Inc., Walter Eugene Nass, d/b/a Nass Trucking, Terrence Turner, Brian Bauer, James Skolek and Donna Skolek, Co-Administrators of the Estate of Todd Skolek, Deceased, Katherine McKay, Tom Armstrong, John Sutton, Tresa Tipler, Bill Koos, Mary Lou McKay, Dennis Lay, Murray Hynes, Brad Shawgo, Tresa Cwick, Joe Fever and Tom Vaccaro, Defendants.

### No. 77–1138.

United States District Court,
C. D. Illinois.

June 7, 1979.

Lyle W. Allen, Peoria, Ill., for plaintiff.

Frederick W. Allen, Peoria, Ill., Jerome Mirza, Bloomington, Ill., Thomas Lee and Jerome Jacobson, Chicago, Ill., William B. Wombacher, R. Michael Henderson, William R. Kelly, Peoria, Ill., for defendants.

## DECISION AND ORDER

ROBERT D. MORGAN, Chief Judge.

Plaintiff seeks a declaratory judgment that its "comprehensive commercial" insurance policy No. 732304–07208990 and "automobile" policy No. 730904–07208990 do not obligate it to defend defendants Midwest Emery Freight System, Inc. (Midwest) or Nass Truck Lines, Inc. (Nass), or its president, Walter Eugene Nass, or to assume liability for personal injuries and property damage that resulted from an accident on July 22, 1977. On that date defendant Turner was driving a tractor owned by defendant Nass and leased to defendant Midwest, pulling a trailer leased by a third

party to Midwest, when it struck a pickup truck, occupied by thirteen people, on U. S. Route 51 in Woodford County, Illinois. One passenger who was injured, and the administrators of the estate of a passenger who was killed, brought suit in state court against Nass, Midwest, and Turner. Plaintiff, Auto-Owners, declined to defend either Midwest or Nass, taking the position that Midwest was not an "additional insured" under either policy, and that Nass was not liable because the truck was engaged in Midwest's business at the time of the accident. Auto-Owners then initiated this action under 28 U.S.C. § 2201, seeking a declaration that their policies did not require involvement in that accident or litigation. Pending before the court are motions for summary judgment by Auto-Owners, Midwest, and Nass.

## I.

The policies at issue were originally issued to Nass in May, 1973, and were renewed on May 1, annually thereafter. Prior to the original issuance, James H. Grier, a licensed insurance broker and employee of the Lyle R. Jager Agency of Kewanee, Illinois, an agent for Auto-Owners, approached Walter Nass, president of Nass, soliciting the liability insurance business of the corporation. Grier's uncontroverted affidavit asserts that he initiated the discussions, that Walter Nass explained that the corporation leased its trucks to Midwest, which carried freight under its own Interstate Commerce Commission permits, and that the lease required Nass to provide drivers and to insure the trucks for liability arising out of their use by Midwest. Grier further swears that he met with employees of Auto-Owners in Peoria, Illinois, prior to the issuance of the policies, and that they decided that Auto-Owners would provide the insurance sought, with premiums based on the gross receipts of the units insured. Subsequently, Grier's affidavit states, the Underwriting Department at Auto-Owners drafted a proposal, which Grier delivered and explained to Walter Nass, and which Nass accepted.

Contemporaneously with the discussions concerning this automobile policy, Grier and Walter Nass discussed a contractual liability policy to cover units under lease from Nass to Midwest. On April 21, 1973, Grier sent a memorandum to Gerald Dickson, of plaintiff's Underwriting Department in Peoria, requesting contractual liability coverage on those units. The handwritten memorandum, on a Lyle Jager Agency form, stated in its entirety:

"SUBJECT: Nass Truck Lines "DATE: 4/21/73

"Jerry, Attached is application for Comprehensive General Liability for the above. We will need contractual liability and I will submit you a copy of the Contract with Emery Freight Lines. They also presently have Personal Liability with limits of 100/300 with a premium of $42.00 if you have a application for this type of coverage, please forward.

Thank you
/s/ Jim Grier"

Following submission of this memorandum, Grier again met with Dickson in Peoria, and, the affidavit states, Dickson requested a sample of the lease between Nass Truck Lines and Midwest Emery. On May 4, 1973, Dickson sent a memorandum to Grier, stating that "[W]e have discussed adding Midwest Emory (sic) as add'l insured. We feel, after review, that all we can do is issue the certificate and show in attached jacket that they would be covered. If we name them we are in a bind then with their filings."

On May 8, Grier sent Dickson a copy of a two-page lease dated May 3, 1972, covering one tractor. An accompanying memorandum, on the same Jager form as the April 21 memorandum, stated that "[a]ttached is a copy of the Contract between Nass and Emery Freight Systems. I trust this is the agreement necessary to issue the contractual liability as requested."

## II

As issued, the jacket of the Automobile Policy, No. 730904–07208990, defined the "insured" as the named insured (Nass Truck

Lines, Inc.) and any person or organization legally responsible for the use of the vehicle, but excepted, among others, any person or organization, or any agent, employee, or contractor thereof, subject to the security requirements of any motor carrier law or regulations because of transporting property for the named insured or for others. Endorsements are attached to the jacket showing that premiums are to be collected on the basis of $1.78 per $100 of gross receipts of each of Nass's tractors, an additional premium of $50.00 annually "for contractual agreement between insured and Midwest Emery Freight System, Inc. Dated: 5–3–72," and "in consideration of an included premium," contractual liability was extended "for the following contract:

"Midwest Emery Freight System, Inc. c/o United Transport Bldg.
7000 S. Pulaski
Chicago, Illinois"
"Dated: 5–3–72."

A Certificate of Insurance was also issued to Midwest on May 30, 1973, reciting under "Classification of Work Covered and Location of Operations," "Contractual liability between the Insured and Midwest Emery Freight, Inc., c/o United Transport Building, 7000 S. Pulaski, Chicago, Illinois. Dated: 5–3–72." An identical certificate was issued on May 19, 1976, and on July 8, 1977, one was issued showing under "Classification of work covered and location of operations" only the notation "Midwest Emery Freight System, Inc.," without the previous address and date notations.

The Comprehensive Commercial Policy, No. 732304–07208990, as issued on April 12, 1977, contained the same definition of, and exception to, "Insured" as did the Automobile Policy, and contained in its Additional Schedule a recitation of "Description of Hazards—Divisions" . . . . "3. Contractual-Agreement between Insured & Midwest Emery Freight System, Inc. Dated: 5–3–72," and recited the premium as "one flat charge" of $65.00 for personal injury and property damage. Also attached was an endorsement extending coverage in consideration of an included premium to Midwest, with the same address and date notations as on the automobile policy endorsements.

## III

The extent of coverage provided under the two policies turns on the construction given the notations on the endorsements and schedule. The physical arrangement of these notations, as well as their contents, in each instance make it ambiguous whether the notation refers solely to one lease on one truck, or to operations of Midwest using Nass's trucks generally, with the date a reference to the one contract as a sample. In the presence of such an ambiguity, extrinsic evidence of prior and contemporaneous dealings of the parties is admissible as an aid in construction. *See, e. g., American Casualty Co. of Reading, Pa. v. Reidy,* 386 F.2d 795, 797 (7th Cir. 1967); 3A Corbin, *Contracts,* § 536, at 28 (1960). Although the memoranda quoted earlier between Grier and Dickson refer to the contract between Nass and Midwest in the singular, the references may be interpreted to mean the contracts between Nass and Midwest generically, an interpretation consistent with the uncontroverted statement in Grier's affidavit that he had requested coverage for all leased equipment of Nass's, with the "5–3–72" lease intended merely as a sample. Further, Dickson stated in his memorandum of May 4, 1973, that Auto-Owners would not name Midwest as an additional insured because that would create "a bind . . . with [Midwest's] *filings*" (emphasis added), but would "issue the certificate and show . . . that they would be covered." The reference to plural *filings* of Midwest and lack of limitation on the extent of coverage provided by the certificate create a reasonable inference that Dickson also understood the "5–3–72" lease to be a sample.

Although the Grier-Dickson memoranda are helpful in determining the terms of the contract, they are not dispositive, because they reflect the state of mind of only one party, Auto-Owners. The mutual understandings of both Auto-Owners and Nass

determine the terms of this contract, and the affidavits of Nass and Grier create no issue of material fact over the intent of those two men. Both affidavits state that Grier initiated the discussions; that Nass explained his leasing arrangement with Midwest, including the fact that numerous units were involved; that the leases required him to insure units; that he sought coverage for all leased units; that the "5–3–72" lease was supplied, at Grier's request, as a sample; and that after May 1, Grier represented to Nass that all leased units were insured. Thus, there was a meeting of the minds between Nass and Grier on the terms of the contracts, and only the reduction of their understanding to writing created an ambiguity. There was no mistake of fact by either Nass or Grier, and both parties intended that the common carrier exclusion be waived by the addition of the subsequent endorsements.

IV

■ It remains to determine whether this agreement is binding on Auto-Owners. It is uncontested that Grier, as an employee of the Jager Agency, had authority to bind insurance for the agency, and that the agency was a general agent of the plaintiff. Knowledge of Grier therefore may be imputed to the plaintiff. *Hartford Accident & Indemnity Co. v. Northwest National Bank,* 228 F.2d 391, 397–99 (7th Cir. 1955) (citing Illinois decisions), and the policies thus obligate Auto-Owners.

■ Three contentions advanced by plaintiff must be rejected specifically. First, plaintiff argues strenuously that Turner was an agent of Midwest at the time of the accident as a matter of law, and that therefore no coverage exists for either Nass, because its tractor was not being used in its business at the time of the accident, or for Midwest, because neither policy covered this tractor while on Midwest's business. Because the policies extended coverage to all tractors leased to Midwest, Turner's agency is immaterial to this case, though it may remain a factual issue in the state court actions.

■ Second, plaintiff argues that Midwest, operating as a common carrier under authority granted by the Interstate Commerce Commission, had complete, nondelegable responsibility to the public for the use of the leased vehicles, which could not be shifted to Nass by means of a contract of indemnity. The first proposition is unexceptionable, *see* 49 C.F.R. § 1057.4(a)(4) (1976); but the second was authoritatively rejected in *Transamerican Freight Lines, Inc. v. Brada Miller Freight Systems, Inc.,* 423 U.S. 28, 96 S.Ct. 229, 46 L.Ed.2d 169 (1975). The lease in this case is, in all material respects, the same as that in *Transamerican Freight,* and therefore is not against public policy or violative of applicable regulations. The accident on July 22, 1977, was precisely the type of risk that Midwest sought to have Nass insure against, and was precisely the type of risk that Nass and Grier contracted to insure against.

■ Third, plaintiff contends that to extend coverage to Midwest for this accident would amount to providing free insurance. "Insurance companies are in the business of selling protection for a fee," plaintiff argues. "They are not eleemosynary institutions." Although the premium charged on the comprehensive commercial (contractual) liability policy was small, perhaps even nominal, neither Nass nor Midwest fixed that premium. The premium on the automobile (gross receipts) policy was charged on the basis of earnings of all of the leased units, and, contrary to the assertion in plaintiff's memorandum, it is sworn by Walter Nass, and uncontroverted by any opposing affidavits, that Nass's books were audited from time to time to assess that premium accurately. Auto-Owners, having assessed premiums and having represented, through its agent Grier, that all of the leased units were covered under the two policies, is estopped from now denying such coverage.

The situation here is the converse of that presented in *Hully v. Aluminum Company of America,* 143 F.Supp. 508 (S.D.Iowa

1956), *aff'd on other grounds,* 245 F.2d 1 (8th Cir. 1956).

In *Hully,* an insurance agent failed to insert a requested endorsement negating the effect of a policy exclusion, and represented to the policyholders that the policy covered the otherwise excluded risk. That decision found the insurance company estopped from denying coverage, based on the agent's negligence. The situation here is, if anything, more compelling for estopping denial of coverage, for the record reveals that plaintiff drafted the policies itself. Any mistake of fact was between plaintiff and its agent, and the burden of such mistake cannot be placed on the policyholder, who relies on the expertise of plaintiff and its agents, and who otherwise here presumably would become liable for breach of its contract to provide insurance on the vehicles it leased to Midwest.

Plaintiff also relies on the unpublished decision in *Federal Insurance Co. v. Country Mutual Insurance Co.,* 24 Ill.App.3d 917, 322 N.E.2d 66 (1975) (abstract only), wherein the lessor of a truck, at the request of the lessee, obtained a certificate of insurance which showed that the lessor was insured against personal injury and property damage liability arising out of the use of the truck, but which contained no policy provisions. That decision is distinguishable from this in that the agent in *Federal Insurance* had no actual or constructive knowledge that the lessee was to be insured, whereas here it is clear that the agent, Grier, had full knowledge of the circumstances surrounding the contract negotiations.

This distinction points up the fundamental flaw in each of plaintiff's contentions: the knowledge of plaintiff's agent, Grier, must be imputed to plaintiff. Because the terms of the policies as issued were ambiguous, prior and contemporaneous extrinsic evidence of the understanding of Grier are admissible to prove the terms of the contracts, and the affidavits of Nass and Grier, the immediate parties to the contracts, show a mutual intent to extend coverage to all leased units. No genuine issue of material fact exists. It follows, and this court holds that, by reason of its policies Nos. 732304-07208990 and 730904-0728990, plaintiff is obligated to defend both Nass and Midwest and to pay any judgment for which either or both of them may become liable as a result of the accident of July 22, 1977. However, the court cannot conclude that plaintiff's position herein has been wholly vexatious and without reason so as to make it liable for attorney fees other than its own in this case.

Accordingly, IT IS ORDERED that the plaintiff's motion for summary judgment is DENIED, and that the motions for summary judgment by defendants Nass Truck Lines, Inc., Walter Eugene Nass, and Midwest Emery Freight System, Inc., are ALLOWED.

IT IS FURTHER ORDERED that the motion of defendants Nass and Nass Truck Lines, Inc., to recover attorneys' fees and expenses, is DENIED.

IT IS FURTHER ORDERED that judgment shall enter against plaintiff and in favor of all defendants.