**WESTFIELD INSURANCE COMPANY,**
Plaintiff–Appellant,

v.

**HANOVER INSURANCE COMPANY,**
Defendant–Appellee.

No. 92–3853.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 10, 1993.

Decided Nov. 16, 1993.

Rehearing and Suggestion for Rehearing
En Banc Denied Dec. 27, 1993.

James J. Shea, Arthur G. Surguine, Jr. (argued), Hunt, Suedhoff, Borror & Eilbacher, Fort Wayne, IN, for plaintiff-appellant.

David T. Kasper (argued), Locke, Reynolds, Boyd & Weisell, Indianapolis, IN, for defendant-appellee.

Before BAUER, EASTERBROOK, and RIPPLE, Circuit Judges.

EASTERBROOK, Circuit Judge.

Summit City Transfer, Inc., leased one of its trucks to Hover Trucking Company, which then engaged Summit City to supply a driver for the truck. While driving the truck on October 2, 1990, Loren Hankey, one of Summit City's employees, ran into another vehicle and killed its driver, Brian Dick. The truck displayed a placard stating that Hover was supplying the transportation. Dick's estate sued Hankey, Summit City, and Hover. Enter the insurers: Westfield Insurance Company, which had issued a policy to Summit City, and Hanover Insurance Company, which had issued a policy to Hover. Westfield and Hanover jointly settled with Dick's estate, reserving their disagreement about their own responsibility: each contends that the other's policy is primary. In this action under the diversity jurisdiction the district court held a trial and decided that Westfield supplied the primary insurance.

Westfield and Hanover agree that Hankey was insured under each policy. Each policy is written as primary insurance. Each provides that if some other policy supplies primary insurance, then it becomes excess insurance. Each addresses the possibility that a truck will be leased or operated under contract and specifies circumstances that will change coverage from primary to excess. Each insurer insists that the other's policy is primary, making its own excess. The district court devoted considerable energy and ingenuity to parsing the terms of the policies and applying them to the complex relations among Summit City, Hover, and two other carriers that, to simplify things, we ignore. As we see things, the exercise was unnecessary and the terms of the policies irrelevant: a statute supplies a clear outcome.

When a claim arises from the operation of a motor vehicle leased under a written lease agreement, if under the agreement the lessee agrees to provide coverage for damage resulting from his operation of the vehicle, then the motor vehicle liability insurance policy of the lessee is primary.

Ind.Code § 27–8–9–9. Summit City signed a lease with Hover, which as lessee agreed to provide insurance for damage arising out of the operation of the truck. It follows that Hanover, Hover's insurer, supplies the primary coverage.

Hanover concedes that there was a signed lease, being carried in the truck at the time of the accident. But Hanover insists that the lease was a sham, designed to fool the Interstate Commerce Commission rather than to govern the relations between Summit City and Hover. What Summit City and Hover really wanted to do, according to Hanover, was lease Hover's operating authority to Summit City rather than lease Summit City's truck to Hover. Hover was authorized to transport freight in interstate commerce but not to make deliveries around Ft. Wayne, Indiana. Summit City was authorized to make local deliveries but not to haul interstate shipments. In order to facilitate efficient operations, Summit City "borrowed" Hover's interstate certificate for inter-terminal movements. Federal law does not permit such transactions, so the parties structured their arrangement as a lease of the truck, which Hover would operate by hiring Summit City to supply a driver. Federal law permits arrangements of this sort, but only if the lease requires the lessee (Hover) to provide the insurance. 49 C.F.R. § 1057.12(c), (j). See generally *Transamerican Freight Lines, Inc. v. Brada Miller Freight Systems, Inc.*, 423 U.S. 28, 96 S.Ct. 229, 46 L.Ed.2d 169 (1975).

After a bench trial, the district judge concluded that the parties did not intend to be bound by their lease. That document, according to the district court, was cosmetic— available for federal inspectors but irrelevant to both Summit City and Hover. The companies signed a separate contract that did not require Hover to provide insurance when Summit City was using its own operating authority. The district judge found that "the relationship of Hover and Summit City was at all times controlled only by the Freight Contract of June 1988". The judge fortified this conclusion by observing that at the time of the accident the truck was delivering cargo locally, which Summit City's operating authority permitted and Hover's did not.

The court allowed that federal law might prevent the parties from applying their contract, rather than the lease, when making use of Hover's operating authority. Nonetheless, the court held, Summit City implicitly borrowed the truck back from Hover when it began making deliveries. Operating the truck as its own sublessee, Summit City could ignore the lease and use the terms of the freight contract. Working through the terms of the insurance policies, the district judge held that Westfield's policy was primary when Summit City was operating the truck in this fashion.

The difficulty with all of this is that neither federal nor state law permits trucking companies to sign leases with fingers crossed behind their backs and to ignore their terms in litigation. As a rule, intelligent adults may decide that their bargains are not enforceable; if they sign a document intending it as a work of art, or ballast, rather than as a contract, a court will not use the writing as the basis of obligations. Alternatively they may want to make real promises but avoid the costs and errors of enforcement by the judicial system. Statutes and regulations may deny people these options, however, and the ICC issued regulations having that effect. Transportation companies are not free to operate on a handshake or with home-brewed terms. They *must* use the terms prescribed in the regulation. *Transamerican*, 423 U.S. at 36–38, 96 S.Ct. at 233–34. The legal effect of the lease depends not on the signatories' "intent to be bound" but on the federal regulation, which binds them to the lease regardless of their desire to make other arrangements. The point of the regulation is to remove from the domain of private choice the terms on which certificate holders may do business. Indiana law then gives the federally-required terms domestic effect. *Rediehs Express, Inc. v. Maple*, 491 N.E.2d 1006, 1009–12 (Ind.App.1986) (holding that the lease applies even if the driver supplied by the lessor operates the truck at variance with the written terms). Thus Summit City and Hover had a lease, whose terms were conclusive even if they wanted it to be a mere decoration (or a tool to deceive the regulators). Federal law offered the parties one

lawful way to rearrange liability: an indemnification clause, which *Transamerican* held consistent with the ICC's regulations. Summit City and Hover did not use this approved method, however.

Federal law would have been satisfied by a single policy of insurance covering the lessee. State law controls priority when there are multiple policies. *Occidental Fire & Casualty Co. v. International Insurance Co.*, 804 F.2d 983, 986 (7th Cir.1986); *Carolina Casualty Insurance Co. v. Insurance Co. of North America*, 595 F.2d 128, 137–39 (3d Cir.1979). The provision we have quoted is unambiguous: the lessee's policy is primary. Indiana does not add: "unless the parties have provided otherwise." Once again, the terms of the parties' contract do not matter. A statute such as § 27–8–9–9 is a simplifier, cutting through what may otherwise be exceedingly complex. Each policy may claim to be primary, or to be excess, or to be primary unless there is some other policy or unless specified circumstances are present. Indiana decided that instead of working through the circumstances case by case it would adopt a bright line rule. Application of that rule cuts down the costs of adjusting claims, which ultimately makes insurance less expensive for the public at large. For Westfield, Hanover, and the insurance industry as a whole, the law of large numbers evens things out: any given insurer issues policies to some lessors and some lessees. If it knows which are which, it may set rates accordingly, confident that the form will control the outcome. Thus everyone (except perhaps trial lawyers) gains when a statute such as § 27–8–9–9 is applied literally.

Three years of litigation and legal fees, a trial, two opinions of a district judge, and one appellate opinion (all of which this case has entailed) are the sort of costs that § 27–8–9–9 makes unnecessary. These costs arose because the judge permitted the parties to deny that the lease "really" governed their operations, and because the judge entertained the possibility that, if the lease does apply, the parties had an unwritten "sublease" arrangement by which the truck passed back and forth between Summit City and Hover according to its cargo and desti-nation. The Indiana statute has its greatest benefits precisely when the parties (and their insurers) have embarked on a complex arrangement, only partly written down and contingent on such things as what cargo was in the truck at a given instant. Nothing in the statute or the cases interpreting it suggests that Indiana would relax the rule just when the complexity of the parties' transaction makes the rule's benefits most apparent.

*Rediehs Express* provides an excellent illustration. Snyder, a driver-owner who lacked a permit to transport cargo in interstate commerce, leased his rig to Rediehs, which assigned Snyder to drive a cargo to Florida. Once in Florida, Snyder picked up a cargo of watermelons for delivery to Wisconsin. Rediehs did not know about or authorize this arrangement. On his way to Wisconsin, Snyder was involved in an accident. The court held that, because the lease had not been modified in writing, Rediehs remained the lessee, and its carrier provided primary coverage. Just so here. The lease had not been modified in writing, and the fact that Summit City was carrying its own cargo therefore did not detract from the fact that Hover was the lessee. Hanover dismisses *Rediehs* as a case concerned with ensuring adequate compensation for victims, but the only question the court considered was whether the lease applied despite the lessor-driver's frolic. It answered yes. From that point § 27–8–9–9 takes over; nothing in the text or function of that statute suggests that an insurer designated as "primary" for purposes of paying claims may nonetheless be "excess" for purposes of adjusting accounts among underwriters.

The judgment is reversed, and the case is remanded with instructions to enter a declaratory judgment that Hanover's coverage is primary.

RIPPLE, Circuit Judge, dissenting.

I respectfully dissent. In my view, the district court made a factual finding which precludes our applying the Indiana statute. Furthermore, I see no incompatibility between the lease-back arrangement at issue here and either the ICC regulations or the Supreme Court's decision in *Transamerican*

*Freight v. Brada Miller,* 423 U.S. 28, 96 S.Ct. 229, 46 L.Ed.2d 169 (1975).

At the time of the accident, the parties had a freight contract with one another. Pursuant to the freight contract, Summit City provided cartage services to Hover. When it provided these services, Summit City maintained complete control of the vehicle, the freight being carried, and the driver. Furthermore, Summit City operated pursuant to its own ICC authority; it did not rely on the authority of any other carrier to deliver goods. The freight contract also contained a section which allowed Hover to lease trucks and drivers from Summit City for interterminal hauls. Subsection G of the section on leasing vehicles provided that the lease provision may be superseded by individual leases of vehicles. The parties entered such a lease on December 27, 1988; this "Motor Vehicle Lease" covered the truck involved in the accident.

The district court determined that the parties conducted their business in the following way. Pursuant to the freight contract, Summit City provided cartage services for Hover and other carriers during the day. When it provided these services, it operated under its own ICC authority. Each night, Summit City would lease a vehicle and driver to Hover to perform interterminal hauls. This lease was effectively terminated each morning when Summit City resumed cartage services. The district court further found that, when the accident occurred, Summit City was providing cartage services pursuant to its freight contract with Hover.

My colleagues suggest that the Motor Vehicle Lease governed the relationship between the parties, that Indiana law therefore governs the outcome of the case, and furthermore, that the Motor Vehicle Lease was necessary to comply with federal regulations. I respectfully disagree. The Motor Vehicle Lease only superseded the lease provisions of the freight contract; the rest of the freight contract remained intact. The Motor Vehicle Lease, therefore, had no effect on the relationship between Summit City and Hover when cartage services were being performed.

Because the parties were operating under the freight contract at the time of the accident, the Indiana statute is not implicated. It states:

> When a claim arises from the operation of a motor vehicle leased under a written lease agreement, if under the agreement the lessee agrees to provide coverage for damage resulting from his operation of the vehicle, then the motor vehicle liability insurance policy of the lessee is primary.

Ind.Code § 27–8–9–9. The first clause of the provision, "[w]hen a claim arises from the operation of a motor vehicle leased under a written lease agreement," effectively removes the situation at issue from the statutory coverage. This claim did not arise from the operation of a motor vehicle leased under a written lease agreement; Summit City was not performing interterminal hauls pursuant to the lease when the accident occurred. Instead, the claim arose from the operation of a motor vehicle by the company which owns it; Summit City was performing cartage services in its own vehicle pursuant to its own ICC operating authority when the accident occurred. Consequently, the Indiana statute does not apply.

My colleagues also rely upon federal regulations and the *Transamerican* case to bolster their determination that the Motor Vehicle Lease was necessary for a lawful arrangement between Summit City and Hover, and that therefore the Motor Vehicle Lease, and not the freight contract, governs this situation. I cannot agree. The cited regulations do not make the lease-back arrangement here unlawful. The regulations define a lease as "[a] contract or arrangement in which the owner grants the use of equipment, with or without driver, for a specified period to an authorized carrier for use in the regulated transportation or property, in exchange for compensation." 49 C.F.R. § 1057.2(e). Under the regulation, a written lease is required when a carrier is performing transportation authorized by its certificate in equipment that it does not own. 49 C.F.R. § 1057.11(a). Such a lease, according to the regulations, must provide specific information and must allocate insurance requirements to the lessee. These regulations do not apply, however, when an authorized carrier is performing services in its own vehi-

cles pursuant to its own authority, as Summit City was when the accident occurred. Admittedly, if Summit City's rig was being used for interterminal hauls at the time of the accident, the regulations would mandate the outcome my colleagues suggest. However, such is not the case.

The *Transamerican* decision does not alter this conclusion. *Transamerican* discusses whether an indemnification agreement pursuant to a lease of equipment was contrary to public policy given the regulations discussed above. In addressing this question, the Court first looked at the policies underlying the regulations. The Court stated that one of the major concerns behind the regulations was the "problem of a transfer of operating authority, with its attendant difficulties of enforcing safety requirements and of fixing financial responsibility for damage and injuries to shippers and members of the public...." *Transamerican,* 423 U.S. at 35, 96 S.Ct. at 233. This abuse was especially likely to occur in a lease arrangement. *Id.* at 36, 96 S.Ct. at 233. When such a lease arrangement was at issue, the Court held, an indemnification agreement was the appropriate method of reallocating the burdens imposed by the regulations. If a lease arrangement were at issue, I would agree that *Transamerican* dictates the only way in which the parties may reallocate the insurance burdens. However, when the parties are not operating according to a lease arrangement, and thus, when there is not the concern of "sharing or lending operating authority," the regulations concerning insurance do not apply and, consequently, *Transamerican* does not apply. Therefore, because Summit City was not leasing the rig and driver to Hover at the time the accident occurred, but instead was operating pursuant to its own authority providing cartage services, these federal requirements are not applicable.

For the foregoing reasons, I would affirm the judgment of the district court.