722 F.2d 1400
 GRINNELL MUTUAL REINSURANCE COMPANY, an Iowa corporation, Appellee,
v.
EMPIRE FIRE & MARINE INSURANCE COMPANY, a Nebraska
corporation, Matthew Youngren, an infant, and Michael
Youngren, an infant, by their Guardian John Youngren and for
the heirs of decedent Judith Youngren, all residents of the
State of Minnesota, and Timothy Youngren a resident of the
State of Minnesota, Appellant,
Sheri Emch, resident of the State of North Dakota, Appellee,
Hamel Service Company, Inc., an Illinois corporation;
Gilbert Culver, a resident of the State of
Illinois, Excalibur Insurance Company of
Minnesota, a Texas
corporation, Appellant.
GRINNELL MUTUAL REINSURANCE COMPANY, an Iowa corporation, Appellant,
v.
EMPIRE FIRE & MARINE INSURANCE COMPANY, a Nebraska
corporation, Matthew Youngren, an infant, and Michael
Youngren, an infant, by their Guardian John Youngren and for
the heirs of decedent Judith Youngren, all residents of the
State of Minnesota and Timothy Youngren a resident of the
State of Minnesota, Riechmann Enterprises, Inc., a Missouri
corporation, Sheri Emch, resident of the State of North
Dakota, Hamel Service Company, Inc., an Illinois
corporation, Gilbert Culver, a resident of the State of
Illinois, Appellees,
Excalibur Insurance Company of Minnesota, a Texas corporation.
Matthew YOUNGREN, an infant and Michael Youngren, an infant,
by their Guardian John YOUNGREN and for the heirs
of decedent Judith Youngren, Appellees,
v.
RIECHMANN ENTERPRISES, a foreign corporation, Gilbert
Culver, Appellees,
Sheri Emch, Appellant,
HAMEL SERVICE COMPANY, INC., a foreign corporation,
v.
Timothy YOUNGREN, Appellee.
Matthew YOUNGREN, an infant and Michael Youngren, an infant,
by their Guardian John YOUNGREN and for the heirs
of decedent Judith Youngren, Appellees,
v.
RIECHMANN ENTERPRISES, a foreign corporation, Gilbert
Culver, Appellees,
Sheri Emch, Appellee,
HAMEL SERVICE COMPANY, INC., a foreign corporation, Appellant,
v.
Timothy YOUNGREN, Appellee.
 Nos. 82-2047, 82-2108, 82-1918 and 82-1960.
 United States Court of Appeals,
Eighth Circuit.
 Submitted May 16, 1983.
Decided Dec. 8, 1983.
 
 Murray G. Sagsveen, argued, Zuger & Bucklin, Bismarck, N.D., for Emch in Nos. 82-1918, 82-1960.
 Chapman & Chapman by Daniel J. Chapman, argued, Bismarck, N.D., for Hamel Services Co., Inc. in Nos. 82-1918, 82-1960.
 Denis McGrady, Jr., argued, Gillespie, Ill., for Hamel Services Co., Inc. in Nos. 82-2047, 82-2108.
 Lommen, Nelson, Sullivan & Cole, P.A., Mark N. Stageberg, argued, Thomas E. Peterson, argued, Minneapolis, Minn., Fleck, Mather, Strutz & Mayer, Steven Storslee, Bismarck, N.D., for Reichmann Enterprises and Excalibur Ins. Co. of Minnesota.
 Lowell A. O'Grady, Michael J. Morley, argued, O'Grady, Morley & Morley, Ltd., Grand Forks, N.D., for Grinnell Mut. Reinsurance Co. in Nos. 82-2047, 82-2108.
 Before LAY, Chief Judge, HEANEY, Circuit Judge, and RENNER, District Judge.*
 LAY, Chief Judge.
 
 
 1
 Two cases are presented to us on appeal. At the trial of one case, Youngren v. Riechmann Enterprises, No. 80-42 (D.N.D. June 28, 1982), the jury determined the comparative liabilities of the drivers of the vehicles involved. The other case, Grinnell Mutual Reinsurance v. Empire Fire & Marine Insurance Co., No. 81-22 (D.N.D. May 5, 1982), was a declaratory action in which the district court decided the relative liabilities of the drivers' employers and insurers. For the purposes of this appeal, we will treat the cases as consolidated as we feel the trial court treated the cases below.
 
 
 2
 This suit arises out of a three-vehicle accident on July 9, 1979. A tractor-trailer unit owned by Hamel Service Company (Hamel) and driven by its employee Gilbert Culver, collided with an automobile driven by Timothy Youngren. A truck driven by Sheri Emch was also involved. As a result of this collision, one passenger in the Youngren automobile died and three were injured.
 
 
 3
 In the action to determine the liability of the drivers, the jury found Gilbert Culver 70% at fault for the accident and Sheri Emch 30% at fault. Sheri Emch appeals from this determination of her liability. Emch challenges the trial court's refusal to instruct the jury on the issue of negligent entrustment and the trial court's refusal to submit to the jury whether Culver acted willfully or wantonly. Integrated with her principal arguments are questions of whether the court properly excluded certain evidence.
 
 
 4
 We have reviewed the record of the jury trial and find no prejudicial error in the court's instructions or rulings on evidentiary issues. We, therefore, affirm the jury's verdict on the comparative fault of Emch at 30% and Culver at 70%.
 
 
 5
 We now turn to the more complex issue of the coverage and liability of Excalibur, Riechmann, Grinnell, and Hamel.
 
 
 6
 At the time of the accident, Hamel's tractor-trailer unit was on a three-year lease to Riechmann Enterprises, Inc. (Riechmann), an interstate motor carrier. On the day of the accident, Culver had finished driving a load of steel for Riechmann to Beulah, North Dakota. On arriving in Beulah, Hamel, through Culver, made arrangements to "trip lease"[1] a load for Bee Line Transport originating in Baker, Montana. The profits of this trip were to be divided solely between Hamel and Culver. The accident occurred during the run from Beulah to Baker during which time the truck was empty. Riechmann's Interstate Commerce Commission permit number was displayed on the side of the truck at all times concerned.
 
 
 7
 Hamel and Riechmann had an agreement that Hamel could trip lease the truck when it was not being used by Riechmann. According to testimony at the trial, documents containing the terms of the trip lease would be signed by the driver "on behalf of Riechmann." Unless Riechmann had arranged for the load, Riechmann received no compensation. There is a question whether the parties had agreed that Riechmann's permit was to be displayed during this trip lease. Such a permit number is required to be displayed at all times and Hamel did not have one of its own. Therefore, the use of Riechmann's number was necessary at least until Culver had reached Baker when Bee Line's number, allegedly, could have been placed on the truck. We can thus infer that Hamel's use of Riechmann's permit was an implied condition of the contract.
 
 
 8
 At the commencement of the trial on the Youngren claims, Riechmann's insurer, Excalibur Insurance Company of Minnesota (Excalibur), paid a settlement of $250,000 for the wrongful death claim and a total of $50,000 for the three personal injury claims (a subrogation claim of Farmers Insurance Group and the claim of a third passenger in the Youngren car are pending).
 
 
 9
 The district court held that at the time of the accident, Grinnell Mutual Reinsurance Company (Grinnell) insured Culver and Hamel for the July 9th collision. In an amended order, the court held further that Riechmann was also liable under the ICC regulations regulating long-haul trucking operations. The court then held that Riechmann and Excalibur were not entitled to recover their costs and expenses from Hamel for defending Culver in the underlying action.
 
 
 10
 Excalibur, Riechmann, Grinnell, and Hamel each appeal from the district court's order. The essential issues presented on these appeals are: (1) whether the Grinnell garage liability policy issued to Hamel provides coverage for the accident; (2) if so, whether Excalibur or Grinnell provided the primary coverage; and (3) whether Riechmann is entitled to indemnity from Hamel. All parties agree that Illinois law controls.
 
 1. The Grinnell Policy
 
 11
 On March 13, 1975, Hamel applied to Grinnell for a "garage liability" policy. The policy was in effect at the time of the accident. The relevant portion of the policy covers bodily injury or property damage "caused by an occurrence and arising out of garage operations, including only the automobile hazard for which insurance is afforded as indicated in the schedule." An automobile hazard is defined, inter alia, as "the ownership, maintenance or use of any automobile owned by the named insured while furnished for the use of any person."
 
 
 12
 Grinnell contends that the phrase "arising out of garage operations" modifies the automobile hazards to which the policy applies; that is, unless an automobile hazard arose out of "garage operations," it is not covered. Although Grinnell's argument has force, this court is bound to follow the substantive law of Illinois in interpreting the insurance contracts. Fidelity Union Trust Company v. Field, 311 U.S. 169, 61 S.Ct. 176, 85 L.Ed. 109 (1940); see Six Companies of California v. Joint Highway District Number 13, 311 U.S. 180, 61 S.Ct. 186, 85 L.Ed. 114 (1940). In Associated Indemnity Company v. Insurance Company of North America, 68 Ill.App.3d 807, 25 Ill.Dec. 258, 386 N.E.2d 529 (1979), the Illinois court was faced with language almost identical to that in the instant case. The court in Associated held that the language referring to injuries arising "out of garage operations, including only the automobile hazard for which insurance is afforded" was ambiguous. Id. at 817-18, 25 Ill.Dec. at 266, 386 N.E.2d at 537. The court observed that the clause could be read either to require that the injury arose out of both operations of a garage and the defined automobile hazard, or to require only that the injury arose out of a defined automobile hazard. The Associated court adopted the latter interpretation because Illinois law holds that an insurance policy's ambiguity is ordinarily to be resolved in favor of coverage. Id.
 
 
 13
 Grinnell's attempts to distinguish Associated are unpersuasive. We find that under Illinois law the policy language is ambiguous and, therefore, should be read to cover Hamel for the July 9th accident.[2]
 
 
 14
 Grinnell argues that the vehicle in question was excluded from the policy at the time of the accident. The relevant portion of the Grinnell policy reads:
 
 
 15
 This insurance does not apply, under the Garage Liability Coverages:
 
 
 16
 * * *
 
 
 17
 * * *
 
 
 18
 (e) To bodily injury or property damage arising out of the ownership, maintenance, operation, use, loading, or unloading of any
 
 
 19
 * * *
 
 
 20
 * * *
 
 
 21
 (2) Automobile
 
 
 22
 * * *
 
 
 23
 * * *
 
 
 24
 (ii) While rented to others by the named insured unless to a salesman for use principally in the business of the named insured....
 
 
 25
 We agree with the district court's statement that "it is difficult for the Court to believe that the lease contract between Riechmann and Hamel is sufficient to preclude Grinnell's duty to extend coverage to Hamel." Although the accident occurred during the period covered by the lease, at the time of the accident Hamel had retaken control of the vehicle and, through its agent Culver, had embarked on a trip for its own benefit. Riechmann was in no way to share in the profits of this trip.
 
 
 26
 The Grinnell policy defines the named insured to include "any person while using, with the permission of the named insured, any automobile to which the insurance applies under the automobile hazard." At the time of the collision, Culver was using the vehicle with the permission of Hamel. Therefore, Culver was included in the coverage of the policy and the policy extended coverage to the July 9th collision.
 
 
 27
 2. The Relationship Between Grinnell and Excalibur
 
 
 28
 ICC regulations state that the carrier to whom the equipment is leased must maintain insurance coverage on the leased vehicle for the protection of the public. 49 C.F.R. Sec. 1057.12(k)(1) (1982). The motor carrier whose number is displayed on the tractor will be held liable to the public for the negligent operation of the leased vehicle. See, e.g., Wellman v. Liberty Mutual Insurance Company, 496 F.2d 131 (8th Cir.1974); Mellon National Bank & Trust Company v. Sophie Lines, Inc., 289 F.2d 473 (3d Cir.1961). Therefore, Riechmann was statutorily liable to the public for the negligent acts of Culver while Culver was driving the vehicle displaying Riechmann's permit number. Apparently, acknowledging this liability, Excalibur paid $300,000 in settlement of various claims against Riechmann. Excalibur now argues that, as the primary insurer for the accident, Grinnell must reimburse Excalibur for the settlement amount.
 
 
 29
 While the ICC regulations do require a motor carrier to maintain public liability insurance and make a carrier liable to the public for negligent acts of the vehicle's driver whenever the carrier's number is displayed, the regulations do not fix the liability between insureds or insurance companies.[3] See Transamerican Freight Lines, Inc. v. Brada Miller Freight Systems, Inc., 423 U.S. 28, 96 S.Ct. 229, 46 L.Ed.2d 169 (1975). In the instant case, Culver was acting as an employee of Hamel at the time of the accident. He was acting within the scope of his duty to Hamel. While he was so acting, Culver was involved in an accident for which he was found to be 70% at fault. Under the common-law theory of respondeat superior, Hamel is liable for the negligence of Culver. See Faltysek v. Kloepfer, 3 Ill.App.3d 8, 279 N.E.2d 105 (1971).
 
 
 30
 This liability is not obviated by the duty to the public that the ICC regulations impose on Riechmann. As the court stated in Carolina Casualty Insurance Company v. Insurance Company of North America, 595 F.2d 128, 138 n. 31 (3rd Cir.1979): "Whatever preemptive effect the ICC regulations may have in that limited field [state regulation of motor carriers] cannot form a basis for arguing that federal law also displaces state law doctrines governing master-servant relationships, respondeat superior, contribution among tortfeasors, or even ordinary negligence."
 
 
 31
 In the instant case, Excalibur paid the settlement based on the liability of Riechmann. The Excalibur policy states that Excalibur agrees "[t]o pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages arising out of the business of the named insured ... as a result of" bodily injury or property damage to others. The policy also states: "If there is other insurance ... against an occurrence covered by this policy, such insurance as is afforded by this policy shall be excess insurance...." The Grinnell policy provides that when "the insured has other insurance which is stated to be applicable to the loss on an excess or contingent basis, the amount of the Company's liability under this policy shall not be reduced by the existence of such other insurance." We find the Excalibur policy is excess insurance under the terms of its policy and therefore Grinnell must be treated as affording the primary coverage. Under the circumstances, Grinnell must reimburse Excalibur for the settlement of the Youngren claims up to the limits of its policy ($100,000 per person up to $300,000 per occurrence). The final division of liability requires Emch to reimburse Excalibur for 30% of the settlement ($75,000 on the wrongful death claim and $15,000 on the personal injury claims of the Youngren passengers), 30% of the Farmers Insurance Group subrogation claim, and 30% of the pending claim of the third passenger in the Youngren car. According to its policy limits, Grinnell must reimburse Excalibur for $100,000 of the wrongful death claim, the remaining $35,000 on the personal injury claims, 70% of the Farmers claim, and 70% of the pending claim of the third Youngren passenger up to $100,000.
 
 3. Indemnity
 
 32
 Riechmann argues that it is entitled to indemnity from Hamel for the amounts Riechmann paid above the Grinnell limits in settlement of the Youngren claims. Riechmann points to Part III, Section 2 of the Hamel-Riechmann lease as establishing the indemnity provision.[4] Hamel argues that, when read in the context of the policy, this clause affects only damage to commodities.
 
 
 33
 We agree with Hamel's contention. The purported indemnity clause is in a section headed "Claims," not under the section headed "Insurance." The preceding paragraph in the claims section refers to "loss of, or damage to commodities." We think it a reasonable rule of construction to assume that the type of claim referred to in the purported indemnity provision was intended to refer to a claim arising from mishandling of cargo by the Contractor (Hamel). We find this provision does not apply in the instant situation.
 
 
 34
 We also agree with Hamel that it should not be required to reimburse Riechmann on a common law theory of indemnity. In our earlier panel opinion, we placed importance on a provision in the Hamel-Riechmann lease which stated that Riechmann agreed to furnish public liability insurance "when said equipment is being used for transportation of commodities for and in behalf of the Company." Because the trailer was empty and on its way to Baker where it would have been loaded with commodities to be transported on Hamel's behalf, we concluded that Riechmann had no duty to Hamel to furnish public liability insurance at the time of the accident. We concluded that, based on the theory of respondeat superior, Hamel had a duty to indemnify Riechmann. On rehearing, we conclude that we were in error in so concluding.[5]
 
 
 35
 Excalibur agreed to insure Riechmann for "damages arising out of" Riechmann's business. Excalibur explicitly acknowledged in the Riechmann policy that "such insurance as is afforded by this policy ... shall comply with the provisions of [any motor vehicle financial responsibility] law ... to the extent of the coverage and limits of liability required by such law." As we have discussed above, ICC regulations require that Riechmann maintain insurance coverage for protection of the public whenever Riechmann's permit is being displayed. The Excalibur policy was procured to satisfy this requirement.
 
 
 36
 Excalibur provided coverage for any operation in which Riechmann was legally responsible. Riechmann was responsible to the public whenever a vehicle was operating under its ICC permit. It is clear that at all times the lease agreement between Hamel and Riechmann was operative. As part of the lease agreement, Riechmann allowed its permit to be displayed when Hamel was trip leasing. Under these circumstances, we think it only reasonable that Hamel had a right to rely on Riechmann to furnish the public liability insurance that Riechmann was required by law to have.
 
 
 37
 We emphasize that the lease was at all times in effect and that Riechmann agreed that its permit was to be used during the relevant portion of the trip lease. We also give significance to the evidence that Culver would sign the trip leases "on behalf of Riechmann." Under the circumstances, Riechmann was a statutory employer and Hamel was also an employer, and as such they stood on equal footing; at the very least, they were joint tortfeasors, and absent contractual agreement no indemnity can be required between them. It would be a windfall for Excalibur for this court to say that Excalibur's coverage applied but that Hamel should reimburse Excalibur for any sums expended.
 
 
 38
 The judgments of the district court are vacated with direction to modify them in accord with this opinion: judgment on the jury verdict involved in the appeal and cross-appeal in Nos. 82-1918 and 82-1960 is affirmed holding Emch 30% at fault and Culver 70% at fault; in the declaratory action in Nos. 82-2047 and 82-2108 we find Grinnell's garage liability policy applicable as providing primary coverage for the July 9th accident; to the extent of its policy limits, Grinnell must reimburse Excalibur for sums paid out under the judgments and the settlement of the Youngren claims; Riechmann's policy with Excalibur provides excess coverage for the accident and Excalibur must pay the amounts not covered by the Grinnell policy; finally, we hold Riechmann and Excalibur are denied indemnity from Hamel and are not entitled to reimbursement for the costs of defending Culver in the underlying action.
 
 
 
 *
 Robert G. Renner, United States District Judge for the District of Minnesota, sitting by designation
 
 
 [1]
 A "trip lease" involves the use by someone other than the lessee of a leased vehicle. Under a trip lease, the non-lessee uses the vehicle for a specific haul of its own. It is common for equipment leases to contain trip lease provisions. This prevents the equipment from standing idle and unproductive when it could otherwise be used
 
 
 [2]
 As author of this opinion, I would dissent on this point. From a reading of the insurance application of Hamel it is readily apparent that the parties never intended that this garage liability policy provide coverage for long-haul trucking operations. On the application, Hamel described its operations as including sales of gas and cars, repair service, and towing. In a space provided for listing "units owned by named insured and not used primarily in the garage business," Hamel listed no vehicles. Hamel answered "no" when asked on the policy if it owned "any automobiles in any business other than garage-type business."
 Also, the existence of other insurance procured by Hamel which potentially covered a situation similar to that involved in the accident leads me to conclude that Hamel was not relying on the Grinnell policy to cover it on its trip lease operations. Hamel had a contract of insurance that is not involved in this appeal with Empire Fire & Marine Insurance Company (Empire). This policy afforded coverage to all vehicles under lease to Riechmann, including the tractor-trailer unit involved in the July 9th collision. The policy covered the tractor when pulling an empty trailer. However, the Empire policy contained an exclusion that limited coverage to a point within a 600 mile radius of Hamel's base of operation and the district court found it did not cover the accident that took place well beyond the 600 mile limit. No appeal has been taken from this ruling.
 
 
 [3]
 For a detailed discussion of the background and purposes of the ICC regulation of motor carriers' use of motor vehicles not owned by them see Transamerican Freight Lines, Inc. v. Brada Miller Freight Systems, Inc., 423 U.S. at 36-38, 96 S.Ct. at 233-34
 
 
 [4]
 Part III, Section 2 of the Hamel-Riechmann lease reads: "The COMPANY and the CONTRACTOR specifically agree: That should any claims arise due to negligence of the CONTRACTOR or his personnel, he shall be fully responsible for his and their negligent and damaging acts and be charged the full amount of said damage."
 
 
 [5]
 We note as well that Riechmann or Excalibur did not urge common law indemnity before the trial court