NORTHLAND INSURANCE COMPANY, Respondent,

v.

**Glenn BENNETT, Michael D. Doble, Respondents,**

**Grinnell Mutual Reinsurance Company, Appellant,**

**James P. Kamphake, d/b/a Kamphake Trucking, Richard O. Miller, Seretha Powell, Respondents.**

No. C1–94–2656.

Court of Appeals of Minnesota,

July 3, 1995.

Thomas A. Gilligan, Jr., Murnane, Conlin, White & Brandt, St. Paul, for respondent.

James E. Hart, Harold Sadoff & Assoc., Minneapolis, for respondent Glenn Bennett.

Theodore J. Smetak, Elizabeth Truesdell Smith, Arthur, Chapman, McDonough, Kettering & Smetak, P.A., Minneapolis, for appellant Grinnell Mut. Reinsurance Co.

Steven J. Drummond, Tillit, McCarten, Johnson, Drummond & Haseman, Ltd., Alexandria, for respondent James P. Kamphake.

Richard G. Day, Edina, for respondent Seretha Powell.

Considered and decided by HARTEN, P.J., and RANDALL and HOLTAN *, JJ.

## OPINION

RANDALL, Judge.

Appellant contests the district court's determination that it is the responsible insurance company for the May 20, 1992, accident involving a truck owned by Richard Miller, arguing that the district court erred by implying a lease between Kamphake Trucking and the truck owned by Miller. We affirm.

## FACTS

On May 20, 1992, an accident occurred between a 1979 Peterbilt semi-tractor truck, owned by Miller and driven by Michael Doble, and a car driven by Seretha Powell. Miller's truck rear-ended Powell's car causing injury to Powell and her passenger, Glenn Bennett. Miller's truck was hauling potatoes from Rice, Minnesota to a Northern Star potato plant in Minneapolis when the accident occurred.

Miller was driving in tandem (following behind) with Doble in a truck owned by James Kamphake at the time of the accident. Miller was driving Kamphake's truck because he had overhauled the engine and was test-driving the truck for Kamphake. Miller's truck, driven by Doble, was hauling potatoes in a trailer owned by Henry Kamphake, James Kamphake's father. James Kamphake's truck was also hauling potatoes to Northern Star. Kamphake was doing business as Kamphake Trucking and was an insured motor carrier under coverage issued by Grinnell.

The police, at the scene of the accident, found Kamphake's "Gold Card" in the cab of Miller's truck. Gold Card is shorthand for "Minnesota Intrastate Carrier Identification of Authority" card issued by the Minnesota Department of Transportation. The Gold Card had Kamphake's name and "Kamphake Trucking" on it in addition to listing the make and license number of Miller's truck.

The police also found a "Form D–1" in Miller's truck. Form D–1 is a "Uniform Identification Cab Card For Vehicle Driveaway Operation Exempt From ICC Regulation" form. Form D–1 listed Kamphake and Kamphake Trucking as the operating carrier in addition to listing the make and serial number of Miller's truck and Miller as the owner of the truck. Kamphake signed Form D–1 on April 1, 1992, and listed his "title" as "owner" under his signature. Form D–1 states that Kamphake certifies the information on the form as true and correct and that he is authorized to possess Form D–1 on behalf of Kamphake Trucking.

The police also found Grinnell's Certificate of Insurance, "Form E," in Miller's truck. Form E is a "Uniform Motor Carrier Bodily Injury and Property Damage Liability Certificate of Insurance" form filed with the Minnesota Department of Commerce. On April 1, 1992, Form E acknowledged Grinnell issued insurance to Kamphake as a motor carrier. Form E dictates that Grinnell's insurance provide automobile bodily injury and property damage coverage to the motor carrier under "the provisions of the motor carrier law of the State" of Minnesota.

At the time of the accident, Miller's truck had no placards or signage with Kamphake's name on it. Miller arranged for the load his truck was carrying. He signed his name to the consignment sheet and indicated the carrier was "Miller Trucking." Northern paid Miller for the load on his truck. Miller paid Doble 25% for driving. Kamphake was paid by Northern for the load driven by Miller and he paid Miller 25% for driving.

Kamphake and Miller were friends and had known each other for approximately three years before the accident. Miller purchased his truck from Henry Kamphake.

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

On March 18, 1992, Kamphake received an Irregular Route Common Carrier (IRCC) permit from the State of Minnesota for Kamphake Trucking. In compliance with Minn.Stat. § 221.141 (1992), Kamphake secured public liability insurance for his motor carrier operations from Grinnell and on April 1, 1992 Grinnell issued Form E, which was placed in Miller's truck. This insurance was in full force at the time of the accident.

At some point during Kamphake's petitioning to the state for motor carrier authority, Kamphake and Miller discussed a formal lease arrangement, which would have allowed Kamphake to lease Miller's truck under Kamphake's authority. Both Kamphake and Miller stated in their depositions that they "abandoned" the lease idea because of its complexities and the expense of insuring the trucks. Kamphake and Miller did not have a formal written lease at the time of the accident.

On April 1, 1992, Kamphake registered his vehicles, including Miller's truck, with the Department of Transportation (DOT). Kamphake also paid Miller's registration fees, filed his rates and tariffs, and attended the Initial Motor Carrier Contact Program. Kamphake also registered Miller's truck on the "Renewal Notice—Intrastate Authority" form filed with the DOT which stated, "all vehicles registered now and during the year will meet the safety requirements" of the Minnesota DOT. The DOT then issued the Gold Card for Miller's truck and listed Miller's truck on its Transaction List and on Kamphake's Vehicle Identifier List.

Miller did not have authority to haul under his own name at the time of the accident, though he later received an IRCC permit under the name of Richlind Express. Miller registered four trucks; two of which were previously registered under Kamphake Trucking and two that were owned by Henry Kamphake. Miller admitted in his deposition that he worked for "Richlind Express which is Kamphake" after the accident.

Powell brought a personal injury action against Miller, Doble, and Kamphake. Northland, Miller's insurer, and Grinnell each brought a Declaratory Judgment action, seeking adjudication of their rights and liabilities regarding the May 20, 1992 accident. The trial court granted Northland's Motion for Summary Judgment, declaring that before the accident Northland had properly cancelled coverage on Miller's truck for nonpayment of premiums and that Northland owed no duty or coverage for any claims involving the May 20, 1992 accident. Both Miller and Henry Kamphake received Northland's notice of cancellation. Henry Kamphake received the notice because he was the previous owner and a lienholder. All sides agree that Northland is no longer a part of this case.

Grinnell moved for summary judgment on its liability arguing Miller's truck was not operating under Kamphake's authority on May 20, 1992. Powell and Bennett cross-moved arguing Grinnell is liable for coverage. Grinnell argued that because there was no formal lease arrangement and because Kamphake and Miller had not complied with all the necessary requirements to operate under Kamphake's authority, Grinnell was not liable for insurance coverage on the May 20, 1992 accident. The trial court denied Grinnell's motion and granted Powell and Bennett's motion, ruling that Miller was operating under Kamphake's authority and that public policy requires some insurance for public liability coverage in the motor carrier regulatory scheme. The trial court held that Grinnell was liable for coverage of Miller's truck for the accident.

Grinnell appeals arguing that Miller was not operating under Kamphake's authority because there was no lease, and therefore, Grinnell had no coverage for the May 20 accident.

## ISSUE

Can a lease be implied between Miller and Kamphake such that Miller was operating under Kamphake's motor carrier authority thereby extending Kamphake's insurance to Miller's truck for the May 20, 1992, accident involving Miller's truck?

## ANALYSIS

Summary judgment may be granted when the pleadings, depositions, answers

to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that either party is entitled to a judgment as a matter of law. Minn.R.Civ.P. 56.03. Summary judgment should not be granted if, after reviewing the evidence, it is determined reasonable persons might reach different conclusions. *Wagner v. Schwegmann's South Town Liquor,* 485 N.W.2d 730, 733 (Minn.App.1992), *pet. for rev. denied* (Minn. July 16, 1992).

 The reviewing court must determine (1) whether there are any genuine issues of material fact, and (2) whether the district court erred in applying the law. *State by Cooper v. French,* 460 N.W.2d 2, 4 (Minn.1990). This court reviews the evidence in the light most favorable to the party against whom summary judgment was granted, and accept as true the factual testimony produced by the non-movant. *Fabio v. Bellomo,* 504 N.W.2d 758, 761 (Minn.1993). Furthermore, all factual inferences are resolved in favor of the non-moving party. *Wagner,* 485 N.W.2d at 733.

### 1. Overview of Motor Carrier Law:

 Federal and state laws and regulations operate in tandem to regulate motor carriers. Federal law regulates interstate commerce pursuant to the Commerce Clause and the Supremacy Clause. U.S. Const. art. I, § 8, cl. 3; art. VI, cl. 2. States are thus left free to regulate intrastate commerce.

To operate as an Irregular Route Common Carrier (IRCC) in Minnesota, the applicant must file a petition with the Commissioner of Transportation. Minn.Stat. § 221.121, subd. 1 (1992). A hearing is held and if the petitioner meets certain standards, a permit will be issued. *Id.* The permit holder then has 45 days to: (1) register all vehicles that will be used under the permit and pay vehicle registration fees; (2) file rates and tariffs; and (3) file and maintain public liability insurance as required by Minn.Stat. § 221.141. Minn.Stat. § 221.122, subd. 1 (1992). The permit holder also has 90 days to attend an Initial Motor Carrier Contact program that discusses carrier authority, the leasing of drivers and vehicles, insurance requirements,

tariffs, annual reports, accident reporting, identification of vehicles, maximum hours of service of drivers, safe operation of vehicles, equipment parts, and inspection, repair and maintenance. Minn.Stat. § 221.124 (1992). The permit holder's authority takes effect when the requirements are met and stays in effect until abandoned, suspended, or revoked. Minn.Stat. § 221.121, subd. 1.

A motor carrier must secure public liability insurance for its operations. Minn.Stat. § 221.141, subd. 1 (1992). The insurance must cover injuries and damage that result from the operation of motor vehicles operating under the permit holder's authority, regardless of whether the vehicle is specifically described in the policy. *Id.* The insurance company providing the insurance must file a Form E with the Commissioner of Commerce, naming each motor carrier insured, and certifying insurance coverage for all vehicles operating under the permit holder's authority, regardless of whether they are specifically listed in the policy. Minn.R. 8855.0400 (1991).

When the vehicle registration is paid, the Commissioner will issue each vehicle an annual Gold Card. Minn.Stat. § 221.131, subd. 2 (1992). The procedure to remove a truck from a carrier's Vehicle Identifier List is described in the Renewal Notice—Intrastate Authority form, which is sent to all new motor carriers.

A motor carrier may lease equipment or a vehicle from a person without authority for use under the motor carrier's authority. *See* Minn.Stat. § 221.031, subd. 6 (1992); Minn.R. 7800.2500–.2700 (1991). The lease shall provide for the exclusive possession, control, and use of the equipment. Minn.R. 7800.2600. The lessee assumes complete responsibility and is considered the owner of the vehicle, including public liability insurance. *Id.* The registered vehicle must comply with certain rules: (1) a copy of the lease must be in the lessor's vehicle at all times; (2) the lessee's name and address must be displayed in required writing on both sides of the leased vehicle; (3) all the service and hauling contracts must be arranged by and in the name of the lessee; (4) the leased vehicle

must carry all bills of lading; (5) the lessor must indicate that the transportation is under the responsibility of the lessee as an authorized carrier. Minn.R. 7800.2700. There is no statute or regulation requiring a motor carrier to file the lease with the DOT, the motor carrier's insurance company, or the Minnesota Department of Commerce.

> The purpose of the leasing rules
> is to ensure that the primary responsibility for the conduct of regulated motor carrier operations remains in the authorized motor carrier, and that the members of the public using motor carrier services are clearly advised of the identity of the responsible carrier, and that the leasing of equipment by an authorized motor carrier from an owner thereof is not a subterfuge for leasing the carrier's permit or certificate to the owner-lessor.

Minn.R. 7800.2500.

■■ The federal motor carrier law is the same in substance and purpose to Minnesota's policies. Federal law requires permitting of common motor carriers. 49 U.S.C.A. § 10923 (West Supp.1994). Carriers are required to have insurance for bodily injury or damage to property. *Id.* Carriers who use other people's vehicles are required to enter into a lease with the owners of those vehicles. 49 U.S.C.A. §§ 10927(a)(1), 11107(a) (West Supp.1994). The lease must be in writing, a copy must be kept in the leased vehicle, there must be liability insurance on the leased vehicle, and the lessee must have control and be responsible for the operation of the vehicle as if it were owned by the motor carrier-lessee. *Id.* The carrier's name and ICC number must be displayed on the leased vehicle. 49 C.F.R. §§ 1057.11(c)(1); 1058.1 (1990). The public policy reason for these provisions is to protect the public by preventing common carriers from evading liability for accidents caused by their drivers. *Transamerican Freight Lines v. Brada Miller Freight Sys.*, 423 U.S. 28, 37, 96 S.Ct. 229, 234, 46 L.Ed.2d 169 (1975); *Zamalloa v. Hart,* 31 F.3d 911, 913 (9th Cir.1994).

### 2. Implied Leases:

The basic issue on appeal is whether a lease can be implied between Kamphake and

Miller such that Grinnell's policy provides coverage for the May 20 accident. All parties agree that at the time of the accident, Kamphake and Miller were not operating under a written lease. The trial court implied a lease from the totality of Kamphake and Miller's contacts, and the strong public policy interests in this area of law. We agree.

Implying leases in motor carrier situations is an issue of first impression in Minnesota. There are no state or federal cases implying leases in the motor carrier liability context.

In one instance, the Ninth Circuit Court of Appeals held that a carrier's insurance company can be liable through an oral lease, not just a written lease. *Zamalloa,* 31 F.3d at 917. In *Zamalloa,* Hart owned a truck and had a written lease with Ken–Ray. After delivery, Ken–Ray released Hart to seek a load from another carrier. Hart called Ligon and Ligon agreed to hire Hart to make a haul and directed Hart to its yard. When Hart stopped for repairs and called Ligon, an agreement was reached where Hart would stop and pick up a load from AT & T and proceed to Ligon's yard to sign the lease and put on Ligon's placards. Hart got in an accident at AT & T while Ken–Ray's placards were still on his truck. *Id.* at 912–13.

*Zamalloa* noted that no cases have held that a written lease is a condition precedent to finding statutory liability on carrier lessees. *Id.* at 917. The court then argued that it would defeat the intent of motor carrier regulations to enable carriers to benefit from their own failure to comply with the regulations. *Id.* at 918. *Zamalloa* concluded by saying the only question that remained was whether the evidence reasonably demonstrated that an oral lease was formed. It found the evidence sufficient and held Ligon's insurance company liable. *Id.*

In *Fuller v. Riedel,* the Wisconsin Court of Appeals inferred a lease under the federal motor carrier laws. 159 Wis.2d 323, 464 N.W.2d 97, 101 (Ct.App.1990). In *Fuller,* the facts were almost identical to *Zamalloa. Fuller* held that a lease could be inferred between the truck owner and the new carrier based on the parties' words and conduct. *Id.*

*Fuller* argued there were enough facts indicating the carrier did not make certain of the truck owner's authority or insurance and proceeded to ship the load anyway, thereby opting for a lease arrangement even though not written. *Id. Fuller* based its analysis on basic contract law. *Fuller* held that contracts can be formed by conduct as well as words and that the words and conduct in that case were sufficient to infer a lease, and therefore insurance coverage. *Id.*

■ Appellant argues that a lease cannot exist where the parties fail to complete the statutory requirements. Appellant argues Kamphake and Miller never completed a lease and Miller was operating independently. We disagree. While it is true that Miller arranged the potato job himself, signed his own name to the manifest, indicated "Miller Trucking" as the carrier, was individually paid, and did not display any placards indicating Kamphake Trucking, the other actions by Kamphake and Miller are sufficient to imply a lease. A common carrier cannot escape liability by arbitrarily following some requirements and not others and then argue that, technically, there was no lease. *See Zamalloa,* 31 F.3d at 918.

Appellant argues the public policy involved is that motor carriers obtain insurance for their trucking operations to protect the public to the extent of the tort liability of the regulated trucker. This statement merely restates the public policy. The public policy is intended to inform the public of the identity of the responsible carrier and protect against carrier abuse of their authority, not to protect the carriers (or their insurers). *See* Minn.R. 7800.2500.

It is a reasonable extension of existing law and in accord with strong public policy to imply an oral lease under these specific facts. The record establishes that Kamphake went to the DOT and represented that Miller's truck would be operating under his authority. The DOT relied on Kamphake's representations when it issued the Gold Card for Miller's truck. Kamphake certified to the DOT that Miller's vehicle would abide by the safety and inspection laws of Minnesota.

Kamphake paid Miller's vehicle registration fee and his tariffs. Kamphake gave Miller a D–1 Form certifying that Miller was operating under Kamphake's authority. Kamphake also gave Miller a Form E, which acknowledged Grinnell as the insurance carrier for Kamphake's motor carrier operation. Furthermore, Grinnell represented to the state that it was covering all trucks operating under Kamphake's authority. Neither Grinnell nor the state required proof of any leases before they granted Kamphake insurance coverage and authority to operate as a motor carrier with Miller's truck listed on its transactions list.

Kamphake attended a course for motor carriers that specifically explained all the details of leasing, insurance, and authority. Kamphake knew or should have known that he represented to Grinnell that the trucks he listed were under his authority. Grinnell should not be allowed to escape responsibility when Grinnell is in the position to ensure its carriers prove the existence of a lease before issuing insurance. *See Fuller,* 464 N.W.2d at 101.

## DECISION

The district court correctly implied a lease between Miller and Kamphake Trucking. Grinnell is the responsible insurance company for the May 20, 1992, accident involving Miller's truck.

**Affirmed.**

HOLTAN, Judge (concurring specially).

We may assume that carriers and insurers are aware of common carrier regulatory laws and will comply or attempt to comply with those laws.

Public policy and the statutory scheme, mandating a written lease before a carrier may use nonowned vehicles, create a presumption that the required lease is formed if any indicium of such a relationship is proven. Such indicium is evidence of an attempt to comply with the statute when viewed objectively. The presumption completes the lease. This lease mandate is to assure that all carrier-used vehicles are properly insured. This presumption ensures the public policy by

protecting the public from uninsured carrier vehicles.

When a carrier uses a nonowned truck and the insurance policy, as is the case here, insures any nonowned truck operating "under the authority of the carrier," public policy and the statutory scheme require that the injured third party share the lighter burden of proving indicia of a lease relationship and the carrier/insurer share the heavier burden of proving by clear and convincing evidence that no lease relationship existed.

This presumption would encourage insurers and carriers to monitor the carrier operation to make clear the carrier's relation to such nonowned vehicles, and to clearly define and document that relationship. Appellants have not done so.